**In re Richard Mitri NAHAT, Debtor.**

**In re Patricia Ann Nahat, Debtor.**

Nos. 4:00–40284–DML–13,
4:02–45793–DML–13.

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

July 22, 2004.

Behrooz P. Vida, Venable & Vida, LLP, Bedford, TX, for Debtor.

Tim Truman, N. Richland Hills, TX, Chapter 13 Trustee Fort Worth.

Craig Alan Bishop, Arlington, TX, Mary A. Daffin, Barrett, Burke, Wilson, Castle, et al., Houston, TX, Dorothy DuBose Scherr, Barbara M. Williams, Linebarger, Gogan, Blair et al., Ft. Worth, TX, for creditors.

### MEMORANDUM OPINION AND ORDER

DENNIS MICHAEL LYNN, Bankruptcy Judge.

Before the court is the objection (the "Objection") of the chapter 13 standing trustee (the "Trustee") to (1) confirmation of Patricia Ann Nahat's ("Patsy") final plan ("Patsy's Plan") and (2) the modification (the "Modification") of Richard Mitri Nahat's ("Richard") (collectively, the "Nahats") confirmed plan ("Richard's Plan") filed pursuant to section 1329(a) of the Bankruptcy Code (the "Code").[1] Patsy's Plan was initially considered by The Honorable Barbara J. Houser at a hearing on August 6, 2003. Approval of the Modification, see Code section 1329(b) and FED. R. BANKR.P. 3015(g), initially came before this court on September 18, 2003. Thereafter, by agreement of Judge Houser and with consent of the Nahats, Patsy's case was transferred to this court by order dated October 28, 2003, so that the Objection, Patsy's Plan, and the Modification could be considered together.

This court held a hearing for such purposes on May 25, 2004, and the Nahats testified at that time. The record before the court, in addition to the Nahats' testimony and the exhibits then offered by the Trustee and the Nahats, also includes the prior proceedings on Patsy's Plan and the Modification, as well as proceedings that led to confirmation of Richard's Plan. The

---

1. 11 U.S.C. §§ 101–1330 (2004).

court will also consider, as appropriate, additional items that are included in the records of Patsy's case and Richard's case.

This matter is subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(b)(2)(L). This memorandum opinion constitutes the court's findings of fact and conclusions of law. *See* FED. R. BANKR.P. 7052 and 9014.

## I. BACKGROUND

The matters presently before the court serve as a sequel to prior proceedings in Richard's case which are described in *In re Nahat,* 278 B.R. 108 (Bankr.N.D.Tex. 2002). In *In re Nahat,* this court held that in a chapter 13 case filed under Code section 301 (as opposed to a joint filing under section 302) by a married individual, the nonfiling spouse's income is not required to be considered in calculating the debtor's disposable income for purposes of plan confirmation, including the requirements of section 1325(b).[2]

Following that ruling, more than two years after Richard's January 18, 2000, filing, Patsy commenced her own chapter 13 case on August 5, 2002. Patsy's Plan provides for payments of $57,504 over sixty months. Patsy's unsecured creditors are to receive eight percent of their claims, which claims total approximately $32,169.

Patsy's testimony was that these creditors' claims arose from use of credit cards in her name only and are not liabilities of Richard. The claims registers and schedules in each of the Nahats' cases are consistent with this testimony, and there is no apparent inconsistency between Patsy's testimony and the schedules and evidence presented in support of confirmation of Richard's Plan. *See In re Nahat,* 278 B.R. at 111. Patsy's Plan also proposes to cure arrearages of $34, 278.77 on the Nahats' homestead and to pay Americredit Financial Services $8,989.30 (with ten percent interest) to satisfy a lien against a 1999 Ford Taurus valued at $8,990.00.[3]

Richard's Plan provided for no return to unsecured creditors, payment of $12,341.30 in full satisfaction of a lien securing approximately $20,000 in debt on a 1993 Infiniti, payments totaling approximately $1,500 by reason of other personal property, payment of slightly more than $4,000 in taxes, and cure of $8,866.04 in mortgage arrearages. Richard's testimony—both prior to confirmation of Richard's Plan and in support of the Modification—is that his unsecured obligations are not liabilities of Patsy.

In connection with confirmation of Richard's Plan (and, thus, prior to Patsy's filing), Patsy testified that she used her in-

---

**2.** Section 1325(b) provides:

(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor ... and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

Code § 1325(b).

**3.** No party has challenged this (or any other) valuation by the Nahats.

come[4] first to pay her separate debts, then to devote any excess to cover household expenses. Though the testimony at the hearing on May 25, 2004, did not support the Nahats' insistence that, after each satisfied separate obligations, remaining funds were pooled to make house payments and cover other expenses of the family, neither did the testimony (or other evidence) necessarily contradict the Nahats' assertions.[5] The court will therefore accept the Nahats' description of how they managed their finances.

By the Modification, Richard proposes to reduce from fifty-three months to thirty-eight months the term of his plan. The result would be total payments under Richard's Plan of $18,145 (as opposed to the present base amount of $24,695). However, because payment of mortgage arrearages and other secured claims would not exhaust Richard's total payments on Richard's current budget (and given Patsy's filing), the Modification would increase return to his unsecured creditors from zero to 13.16%.

The Trustee's concern that the Nahats are not devoting their entire disposable income of thirty-six months, as required by Code section 1325(b)(1)(B), motivated the Trustee's objections to confirmation of Richard's Plan and now has led to the Objection. The Trustee argues that Richard, rather than satisfying mortgage arrearages as provided in his plan, allowed them to grow substantially. Moreover, the Trustee asserts that the Nahats reflected on their individual Schedules I and J some payments of common obligations, e.g., the mortgage, thus double-counting expenses and artificially reducing their joint disposable income since commencement of their cases.

The court's analysis of these matters is complicated by Richard's varied employment history. At the time of confirmation of Richard's Plan, Richard had changed jobs a number of times while in chapter 13. See In re Nahat, 278 B.R. at 110. Richard's sporadic employment pattern has apparently continued. Thus, it is difficult for the court to establish with any precision the Nahats' joint (or individual) disposable income.

The Trustee also has raised good faith issues. The Trustee notes that the effect of the separate filings by Richard and then Patsy is to provide the Nahats with chapter 13 protection for almost eight years. The Trustee expresses particular concern about the length of time the Nahats' mortgagee will be subject to the automatic stay pursuant to Code section 362(a) and about the substantial arrearages owed to the mortgagee.[6] The mortgagee did not object, however, to either Patsy's Plan or the Modification.

4. Patsy is a long-time employee of American Airlines.

5. Patsy testified that Richard paid the bills of the community from his checking account. Patsy paid bills for her credit cards and other debts from her account. Patsy testified that she never transferred funds to Richard. This suggests that Patsy's income (all of which went into her account) was not used to satisfy common obligations. However, Patsy also testified that she had borrowed against her 401K plan to cover family debts. Also, though it would raise a question as to whether her credit card debt was not community in character, the court assumes Patsy may have incurred credit card debt on behalf of the family. Patsy's testimony on February 14, 2002, in support of Richard's Plan was that her credit cards were used in aid of personal travel. That may not have continued, or Patsy may have paid some community bills directly.

6. From Patsy's Plan and the schedules in these chapter 13 cases, it appears the Nahats have considerable equity in their home, even after considering the arrearages.

## II. ISSUES

First, the court must decide whether there is a bar or limit to Patsy's initiation of her chapter 13 case and the proposal of Patsy's Plan. It is the commencement of Patsy's case, after all, which has extended the Nahats' bankruptcy protection well beyond the five years contemplated by Congress. *See* Code § 1322(d).[7]

Second, the court must analyze the combined effect of Patsy's Plan, Richard's Plan, and the Modification. The inquiry here will largely be directed toward whether the Nahats have acted in good faith or have abused the bankruptcy system.

Finally, the court must test Patsy's Plan and the Modification to ensure that each meets the requirements of chapter 13. *See* Code §§ 1322, 1325, and 1329. In considering whether Patsy's Plan and the Modification are confirmable, the court must ensure that each provides, as required by section 1325(b)(1)(B), for payment by the debtor of thirty-six months of disposable income for the benefits of creditors.

## III. DISCUSSION

### A. May Patsy File Under Chapter 13 and Confirm a Plan?

 It would seem clear that Patsy may not be denied the benefit of chapter 13. Whether a debtor is eligible for chapter 13 is determined solely by whether the debtor meets the eligibility requirements of Code section 109(e). In construing section 109(e), the court must adopt the plain meaning of the statute. *See Lamie v.*

*United States Trustee*, 540 U.S. 526, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004) (concluding that when the language of a statute is plain and does not lead to an absurd result, the sole function of the court is to enforce the statute according to its terms); *Toibb v. Radloff*, 501 U.S. 157, 162, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) (concluding that where resolution of a question of law turns on a statute, courts must look first to the statutory language); *Union Bank v. Wolas*, 502 U.S. 151, 158, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991) (finding that the fact that Congress may not have foreseen all the consequences of a statutory enactment is not sufficient reason for refusing to give effect to the statute's plain meaning); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (finding that if a statute's language is plain, the sole function of the courts is to enforce the statute according to its terms). In fact, the Supreme Court has twice held that a person may file a petition under a chapter of the Code so long as the person meets the requirements of and is not barred by the terms of section 109. *See Toibb*, 501 U.S. at 160–61, 111 S.Ct. 2197; *Johnson v. Home State Bank*, 501 U.S. 78, 82, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991).

Section 109(e) requires that a chapter 13 debtor (1) be an individual; (2) have "regular income"; and (3) owe unsecured debts below the limits set in the statute. Code § 109(e). *See also* Code § 104 (providing for adjustment of dollar amount limits). Under section 109(g), a debtor may not file a chapter 13 case in certain circumstances.[8] Those circumstances are not present here, and Patsy is an individual

---

7. Section 1322(d) provides:
 (d) The plan may not provide for payments over a period that is longer than three years, unless the court, for cause, approves a longer period, but the court may not approve a period that is longer than five years.

Code § 1322(d).

8. Section 109(g) provides:
 Notwithstanding any other provision of this section, no individual or family farmer may be a debtor under this title who has been a

with regular income who owes less than the statutorily set maximums. There is no suggestion anywhere in the Code that Richard's filing in some way deprived Patsy of the ability to utilize chapter 13. Thus, Patsy was eligible to file for chapter 13. If Patsy can file for relief under chapter 13, logic dictates that she should be able to propose a plan confirmable under section 1325. It would defy common sense to hold that a debtor could begin a chapter 13 case but could not, as a matter of law, achieve the very result contemplated by the statute.

■ That the effect of Patsy's filing is to extend the Nahats' joint chapter 13 experience beyond five years does not limit Patsy's right to file her case or to propose a sixty-month plan. The limitation on the length of plans was a response by Congress to concerns that a plan of too long a duration might amount to involuntary servitude. *See generally* H.R.REP. No. 95–595, at 117, 321–22 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6078 (explaining that Congress's rationale in limiting the length of a chapter 13 plan period was to avoid "becom[ing] the closest thing there is to involuntary servitude"); S.REP. No. 95–989, at 33 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787 (same); 2 COLLIER ON BANKRUPTCY ¶ 303.02[1] (15th ed.

rev.2004) (explaining that Congress's concern about involuntary servitude and the Thirteenth Amendment to the Constitution is revealed by the statute's prohibition of involuntary chapter 13 cases); *In re Noonan*, 17 B.R. 793, 799 (Bankr.S.D.N.Y. 1982) (explaining that "Congress acted to dispel even the remotest possibility of involuntary servitude by prohibiting involuntary chapter 13 cases").

Indeed, the caselaw addressing when the court may authorize a plan of more than thirty-six (but not more than sixty) months under section 1322(d) overwhelmingly suggests that the cause shown for extending the time must benefit the debtor in some way.[9] If the effect of the separate filings by Patsy and Richard is, in essence, to expand the sixty-month time limit, the lesson of these authorities is that possible prejudice to a secured creditor is not a valid reason to conclude that the Nahats' conduct is improper. In sum, then, the eight-year duration of the Nahats' collective bankruptcies and the *seriatim* filings by Richard and Patsy are not *per se* improper.

### B. The Nahats Have Acted in Good Faith

■ The Trustee, however, urges that the extra years of protection gained by the

---

debtor in a case pending under this title at any time in the preceding 180 days if—
(1) the case was dismissed by the court for willful failure of the debtor to abide by orders of the court, or to appear before the court in proper prosecution of the case; or
(2) the debtor requested and obtained the voluntary dismissal of the case following the filing of a request for relief from the automatic stay provided by section 362 of this title.
Code § 109(g).

9. *See generally In re Simmons*, 288 B.R. 737, 752 (Bankr.N.D.Tex.2003) (explaining that precedent suggests that "cause" is to be determined in terms of benefit to the debtor)

(citing *Villanueva v. Dowell (In re Villanueva)*, 274 B.R. 836 (9th Cir. BAP 2002); *Wash. Student Loan Guar. Ass'n (In re Porter)*, 102 B.R. 773 (9th Cir. BAP 1989); *In re Pedersen*, 229 B.R. 445 (Bankr.E.D.Cal.1999); *In re Burris*, 208 B.R. 171 (Bankr.W.D.Mo.1997); *In re Greer*, 60 B.R. 547 (Bankr.C.D.Cal. 1986)); 8 COLLIER ON BANKRUPTCY ¶ 1322.17[1] (15th ed. rev.2004) (discussing that extensions of time up to the five-year maximum should be allowed without difficulty because debtor may not otherwise be able to obtain effective relief under chapter 13). *See also* Code § 524(c) (providing rigorous standard for permitting reaffirmation of an otherwise dischargeable debt which focuses on the debtor's interests and rights).

Nahats should be seen as a violation of the good faith requirement of section 1325(a)(3) of the Code.[10] Serial filings intended to frustrate the remedies of secured creditors have often been held to be in bad faith. *See Casse v. Key Bank Nat'l Ass'n (In re Casse)*, 198 F.3d 327, 332 (2d Cir.1999) ("Serial filings are a badge of bad faith."); *In re Spectee Group, Inc.*, 185 B.R. 146, 156 (Bankr.S.D.N.Y.1995) (same); 3 COLLIER ON BANKRUPTCY ¶ 362.07[6][a] (15th ed. rev.2004) (discussing that patterns and conduct which have been characterized as bad faith include serial filings). In this district it is standard practice for the Trustee to move to dismiss a case for serial filing. Courts have generally found that lack of good faith is a sufficient basis to support dismissal of a case. *See e.g., In re Casse*, 198 F.3d at 332; *In re McCormick Road Assocs.*, 127 B.R. 410, 415 (N.D.Ill.1991). *See also* Code § 1307(c)(1) (enumerating statutory grounds to dismiss a chapter 13 case for lack of good faith).

■■■■ However, a standard used to determine whether a petition is filed in bad faith and subject to dismissal under Code section 1307(c) is not necessarily applicable in assessing conformance of a plan with the requirement of section 1325(a)(3) that "the plan [be] proposed in good faith and not by any means forbidden by law." Code § 1325(a)(3). In the Fifth Circuit, that "good faith" test is met if the debtor's plan is truly intended to effect rehabilitation. *See Ramirez v. Bracher (In re Ramirez)*, 204 F.3d 595, 600–01 (5th Cir.2000) (affirming that a chapter 13 filer's good faith is viewed in light of the "totality of the circumstances" test under which the

court considers factors such as the reasonableness of the proposed repayment plan and whether the plan indicates an attempt to abuse the spirit of the Code); *In re Chaffin*, 836 F.2d 215, 217 (5th Cir.1988) (emphasizing that the good faith inquiry under section 1325(a)(3) of the Code "requires a careful examination of the totality of the circumstances" because "without further fact-finding by the bankruptcy court we cannot 'tell whether [debtor] and [debtor's] counsel are playing games or filing a bona fide plan that must be confirmed if it meets all six requirements of 11 U.S.C. § 1325'") (citation omitted).

Even if the bad faith imputed to a serial filer were a proper gauge under section 1325(a)(3), the court has not found or been cited to a case which penalizes one spouse for seeking relief during the pendency of the other spouse's case. Rather, the serial filing ban has typically been applied where successive filings follow dismissal of earlier cases. *See, e.g., In re Casse*, 198 F.3d at 341–42 (declining to disturb the bankruptcy court's finding that the debtor's serial filings were made in bad faith and finding that the bankruptcy court did not abuse its discretion by (1) barring the debtor's most recent filing and (2) refusing to vacate the foreclosure sale of debtor's property). The successive multiple filings by the husband and wife in *In re Copeland*, 268 B.R. 273 (Bankr.D.Kan.2001), were addressed in a very different context than plan confirmation and *In re Smith*, 200 B.R. 213 (Bankr.E.D.Mo.1996), presented a very different fact pattern from the case at bar. This court is not prepared to extend, in the context of the Objection before the court, the reasoning of bad faith filings to pre-

---

**10.** Section 1325(a)(3) provides:
(a) ... the court shall confirm a plan if—
(3) the plan has been proposed in good faith and not by any means forbidden by law.

Code § 1325(a)(3). *Cf.* FED. R. BANKR.P. 3015(f), not applicable due to the Objection.

vent confirmation of a plan that would otherwise meet the tests of section 1325.

Nor does the Trustee's concern that the Nahats' mortgagee is prejudiced by the continuation of the automatic stay protection for the Nahats' homestead from Richard's filing until the completion of Patsy's Plan—a period of about eight years—support a finding of lack of good faith under section 1325(a)(3). The mortgagee has not objected to Patsy's Plan. Should the mortgagee feel itself aggrieved by the length of stay protection, it may seek relief under Code section 362(d). The court will not, of course, address at this juncture whether the Nahats' conduct could constitute grounds (or a factor) in finding cause for relief from the stay. *See* Code § 362(d)(1).

Finally, the evidence before the court does not indicate that the Nahats have acted in a wrongful fashion that would amount to bad faith. Richard's peripatetic progression of jobs appears to be the primary reason for the family's need for bankruptcy relief. Changes in a person's employment, at least absent a showing of frivolous disregard by that person of his pecuniary obligations or other peculiar facts, cannot amount to bad faith. There is no evidence that Richard's conduct justifies denial to either him or Patsy of relief under the Code.

## C. Other Requirements for Confirmation and Modification Approval

The Trustee does not argue that the Modification or Patsy's Plan fails any tests other than (1) the test for good faith (already addressed); (2) the requirement that there be no unfair discrimination, *see* Code section 1322(b)(1), incorporated by Code section 1325(a)(1)[11]; and (3) the requirement of section 1325(b)(1)(B) that a debtor dedicate thirty-six months of disposable income to his or her plan.[12] The evidence before the court supports confirmability of Patsy's Plan under the remaining tests of section 1325(a). The court need not address other requirements for confirmation in connection with approval of the Modification, because the Modification does not so alter Richard's Plan as to require a fresh review of the evidence, and the determination of compliance with Code section 1325(a) made by the court when confirming Richard's Plan[13] is *res judicata* in the consideration of the Modification.[14]

The court therefore concludes that Patsy's Plan is confirmable unless it discriminates unfairly or fails to meet section

---

11. The court's holding in *In re Nahat*, 278 B.R. at 114, that Richard's Plan did not discriminate unfairly is *res judicata*, as discussed below.

12. The Trustee's concern for the Nahats' mortgagee does not appear to taint either Patsy's Plan or the Modification. Neither of the Nahats proposes to violate section 1322(d)'s sixty-month time limit for plans; and Code sections 1322(a)(2) and (a)(5) contain no language that would require the court to construe the Nahats' plans as being limited to a joint term of sixty months in separately impairing a common secured creditor.

13. *See In re Nahat*, 278 B.R. at 115 (finding "no basis in chapter 13 or the Bankruptcy Code in general for denying confirmation of [Richard's] plan").

14. *See In re Stage*, 79 B.R. 487, 488 (Bankr. S.D.Cal.1987) ("It is well-settled law that an order confirming a Chapter 13 plan is ... [r]es judicata to all justiciable issues which were or could have been decided at the confirmation hearing.") (citations omitted). *See also Mass. Housing Fin. Agency v. Evora (In re Evora)*, 255 B.R. 336, 343 (D.Mass.2000) (finding that the order of confirmation is considered *res judicata* as to claim determinations); 8 COLLIER ON BANKRUPTCY ¶¶ 1329.02, 1329.03 (15th ed. rev.2004) (explaining that a confirmed plan is *res judicata* as to all issues that could have been raised at the confirmation hearing).

1325(b)(1)(A)'s requirement of dedicating thirty-six months of disposable income to her plan. The Modification may be approved if, after its approval, Richard's Plan still satisfies the thirty-six month test.[15]

### 1. Unfair Discrimination

■ The Nahats present an unusual circumstance in that each claims a separate set of unsecured creditors. Because Richard's Plan and Patsy's Plan each provide but one class for unsecured creditors, nothing internal to either plan could effect discrimination.[16] Section 1322(b)(1) refers to discrimination among classes within a single plan. *See* Code § 1322(b)(1) (providing that "the plan may—(1) designate a class or classes of unsecured claims ... but may not discriminate unfairly against any class ...". The Objection, however, is based on the difference in treatment of unsecured creditors under Patsy's Plan as compared to Richard's Plan. The Objection thus asks the court to compare treatment of similar creditors under different plans. Whatever that comparison might show, it could not prove a violation of the unfair discrimination test.

**15.** Section 1329(b)(1) of the Code, which governs approval of modifications, states that sections "1322(a), 1322(b), and 1323(c) of this title and the requirements of section 1325(a) of this title apply to any modification...." Some authorities have interpreted the omission of section 1325(b) from this provision to exempt modifications from the thirty-six month test. *See Forbes v. Forbes (In re Forbes)*, 215 B.R. 183, 192 (8th Cir. BAP 1997) (concluding that the "best efforts" test pursuant to section 1325(b) "is not a factor to be construed by a court in approving postconfirmation modifications"); *In re Moss*, 91 B.R. 563, 566 (Bankr.C.D.Cal.1988) (finding that the court should not reexamine the debtor's disposable income when deciding on postconfirmation modification because section 1325(b) is omitted from list in section 1329(b)). The court is persuaded otherwise. Section 1329(a) allows proposal of modifications by an unsecured creditor or the trustee, as well as the debtor. That provision is not consistent with exemption of a modification from the test of section 1325(b)—which provision itself is to be invoked by an unsecured creditor or the trustee. Moreover, it would not make sense to allow a debtor to modify his or her way around section 1325(b). Numerous authorities agree that section 1325(b) applies to modifications. *See, e.g., In re McKinney*, 191 B.R. 866, 869 (Bankr.D.Or. 1996) (concluding that if a plan is modified after confirmation, it must comply with the requirements of section 1325(b)); *In re Klus*, 173 B.R. 51, 58 (Bankr.D.Conn.1994) (finding that an objection to approval of a modification could implicate section 1325(b)); *In re Solis*, 172 B.R. 530, 532 (Bankr.S.D.N.Y.

1994) (determining plan modifications must be made in accord with the ability–to–pay test of section 1325(b)). The court thus concludes that, upon the invocation by the Trustee or a creditor, section 1325(b)(1) must be complied with when *modifying a plan under section 1329.* According significance to the absence in section 1329(b) of any reference to section 1325(b) would be inconsistent with the balance of chapter 13 and with section 1329(a). The Code must be read holistically to avoid, through tunnel-vision, reaching an absurd result. *See Bell v. Bell (In re Bell)*, 225 F.3d 203, 215, 222 (2d Cir.2000) (explaining that "statutory construction ... is a holistic endeavor" meant to avoid "absurd or futile" results); *In re Lifschultz Fast Freight Corp.*, 63 F.3d 621, 625 (7th Cir.1995) (confirming that statutory construction is a holistic endeavor intended to "look beyond express language of [a] statute ... where a literal interpretation would lead to absurd results") (citation omitted); *In re Preston*, 233 B.R. 375, 377 (Bankr. E.D.Tex.1999) (agreeing that the holistic construction of a statute avoids absurd results and produces a meaning or effect that is compatible with the intention of the legislature).

**16.** Discrimination could occur through overvaluing a secured claim, thus preferring the secured creditor's deficiency. Whether such discrimination would violate the prohibition of section 1322(b)(1), which provides that "the plan may ... designate a class or classes of unsecured claims ... but may not discriminate unfairly against any class so designated," is not before the court, as none of Patsy's *valuations of collateral have been challenged.*

Moreover, as discussed in *In re Nahat,* by excluding Richard's declared unsecured debts from Patsy's Plan, Patsy risks being held liable for those debts, because she will not be discharged as to them. *See In re Nahat,* 278 B.R. at 114 n. 7 (questioning whether discharge of debts without notice to creditors is consistent with due process requirements of the United States Constitution) (citing *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Reliable Elec. Co., Inc. v. Olson Constr. Co.,* 726 F.2d 620 (10th Cir.1984); *Cody v. Cody (In re Cody),* 246 B.R. 597, 600 (Bankr.E.D.Ark. 1999)). The same is true for Richard with respect to Patsy's debt. The court thus concludes that Patsy's Plan does not discriminate unfairly.[17]

## 2. Disposable Income

The requirement for confirmation that a debtor devote thirty-six months' income to his or her plan is one of the alternative requirements for confirmation established by Code section 1325(b)(1).[18] Because neither Patsy's Plan nor the Modification provides satisfaction to unsecured creditors equal to their claims, section 1325(b)(1)(B) comes into play, and to confirm Patsy's Plan or approve the Modification the court must find that it "provides that all ... projected disposable income to be received in the three-year period ... will be applied

to make payments under the plan." Code § 1325(b)(1)(B).

### a. Patsy's Plan

■ Patsy's Plan proposes payments of $57,504 over a sixty-month period. Patsy's Schedules I and J, as amended May 18, 2004, reflect net income of $2,078.40 and expenses of $810.00, respectively.[19] This yields a monthly disposable income of $1,268.40 or $45,662.40 for thirty-six months. However, Patsy's gross monthly income is $3,466.67, and her Schedule I reflects deductions of $28.17 for a "PC Purchase Plan" and $574.23 for a "401K Loan Payment." The Trustee would add back a large enough portion of the 401K payment that Patsy's disposable income for thirty-six months would exceed the proposed payments under her plan.

But Patsy's Plan assumes approval of the Modification. If the Modification is approved, Richard will contribute more funds to payment of household expenses. Richard would assume full responsibility for current payments for the family mortgage ($1,970), utilities ($600), and maintenance ($100). As Richard's ability to do so is dependent in part on his not making further payment (at $350 per month) under his plan, Patsy can rightfully claim that her disposable income should be reduced by at least the amount of Richard's payment.[20] Even adding back the entire

---

**17.** It is true that Patsy preferred some creditors over others prior to her filing (compare Richard's initial Schedules I and J to Patsy's). Congress, however, intended Code section 547 as the means to address prepetition preferences, not the unfair discrimination provisions of section 1322(b)(1) and its cognates, Code sections 1222(b)(1) and 1129(b)(1).

**18.** *See supra* note 2.

**19.** Earlier versions of Patsy's schedules reflected higher expenses (see, for example, June 23, 2003, Schedule J, auto insurance)

and higher income (Patsy's compensation from American Airlines has since been reduced). Under earlier versions of Patsy's budget, it appears her disposable income would be lower.

**20.** The court might have calculated Patsy's disposable income in various ways and does not hold that its method of calculation is the proper one; it is, however, the one most likely to yield the highest disposable income for purposes of Code section 1325(b)(1)(B). Alternatively, the court might have allocated up

401K payment and the PC Purchase Plan payment to Patsy's disposable income, Patsy's disposable income (including making up the loss of Richard's $350 per month payment) would be $1,520.80 per month or $54,748.80 over thirty-six months.[21] As Patsy's Plan proposes total payments in excess of $57,000, it meets the requirements of section 1325(b)(1)(B), because the court holds *infra* that the Modification may not be approved. Therefore, the court holds that Patsy's Plan will be confirmed.

### b. The Modification

■ At the time of the confirmation of Richard's Plan, his February 2002 Schedule I reflected gross income of $5,000 and net income of $4,150. Taking into account Patsy's contribution of $1,155 to the community, the total net available to Richard to pay expenses of the community and fund his plan according to his Schedule I was $5,305. As Richard's contemporaneous Schedule J provided for expenditures of $4,985, to meet the test of Code section 1325(b)(1)(B) Richard's Plan had to provide for payments to the Trustee of at least $11,520 ($320 per month multiplied by thirty-six months). In fact, Richard's Plan provided for $24,695 in payments to the Trustee.

With the exception of one $400 payment, the Modification would eliminate the re-maining payments under Richard's Plan. The total paid to the Trustee by Richard if the Modification is approved would be $18,145. At first blush, because $18,145 substantially exceeds the calculation of disposable income at the time of confirmation of Richard's Plan, it would appear that the court should approve the Modification. However, proposal under section 1329(a) of a modification to a confirmed plan results from changes in the debtor's circumstances that alter the debtor's disposable income. *See* 8 Collier on Bankruptcy ¶ 1329.02 (15th ed. rev.2004) (discussing that modifications to a plan may be made for a number of reasons, including a decrease in debtor's income); 5 Norton Bankruptcy Law and Practice 2d § 124:2, at 124–20 (2001) (explaining that courts will allow postconfirmation modifications when debtor is able to demonstrate a change in circumstances warranting modification to the plan).

The change in Richard's circumstances[22] that led to the filing of the Modification was commencement of Patsy's chapter 13 case. Upon commencement of her case, Patsy ceased paying her own unsecured creditors, thus making available for community needs more of her net income. This, in turn, would free up more of Richard's income as "disposable income" to be paid to the Trustee.

---

to half of the Nahats' mortgage and half of other common costs to Patsy.

21. The court recognizes that Patsy's Plan will extend more than two years beyond Richard's Plan (without approval of the Modification). For reasons discussed below, calculation of past (or future) disposable income of the Nahats is even more imprecise than is ordinarily true. As the Trustee would allow at least part of the 401K Loan Payment and the PC Purchase Plan payment, the court concludes that Patsy's disposable income has been shown by a preponderance of the evidence to be at least

thirty-six months of what she has had and would have available.

22. Richard has apparently suffered numerous changes in circumstances because of his varied employment. Arguably, Richard might have sought modification of his plan whenever his income changed materially. It does not appear that amended schedules I and J were filed each time Richard's situation changed, though the court reviewed five budgets for Richard filed prior to confirmation of his plan, and the court has before it three revised Schedules I and J filed subsequently.

Richard's most recent Schedules I and J, filed October 10, 2003, show $4,345 in net income and $3,972 in expenses, respectively. While these numbers yield a figure of $13,428 as Richard's disposable income over thirty-six months, the expense total is based on Richard paying the entire current payment on the family mortgage ($1970) and the total required for utilities ($600).[23] If half that burden were borne by Patsy, Richard's disposable income would increase to $1,658 per month or $59,688 over thirty-six months.

The court, of course, recognizes that Patsy filed her chapter 13 case nearly thirty-one months after Richard filed his chapter 13 case. Because Richard's disposable monthly income increased only upon Patsy's filing, Richard's projected disposable income must be recalculated only from that date. However, that the overlap of Richard's first thirty-six months in chapter 13 (payment thirty-six due February 3, 2003) and Patsy's chapter 13 (filed August 5, 2002) was only six months does not limit recalculation to that overlap period. Not only must the court potentially recalculate to reflect Richard's disposable income in various employments, the court must also account for any "cushion" between Richard's payments during the first thirty-six months of his plan and income of which he might dispose.[24]

Because Richard's employment history has been irregular, the court does not have sufficient data to calculate Richard's disposable income for thirty-six months.[25] Suffice it to say, however, that the Modification cannot be confirmed because, based on a preponderance of the evidence, the court cannot find that Richard's Plan, after the Modification, will provide for payments to the Trustee of at least three years of Richard's disposable income as projected at appropriate times.

■■■ The court's holding upon which this case turns is that separately filing spouses whose chapter 13 cases overlap must share the burden of their community living expenses in an equitable fashion such that the amount payable to the Trustee pursuant to section 1325(b)(1)(B) under each spouse's plan totals at least as much as it would were the spouses treated as joint debtors during the overlap period.

## IV. CONCLUSION

Because the Modification is not approved, Richard's Plan remains in effect. Because Patsy's filing has increased Richard's disposable income—and made possible a dividend to Richard's unsecured creditors—the Trustee may wish to propose a modification to Richard's Plan pursuant to Code section 1329(a) and FED. R. BANKR.P. 3015(g) in order, at least, to provide for payments to unsecured creditors.

---

23. In a sense, with both debtors in chapter 13, it could be said that the plan of either would discriminate against unsecured creditors if one debtor paid more than his or her fair share of common costs. As this is not discriminatory *classification*, however, it does not violate Code section 1322(b)(1). The situation in *In re Smith*, 200 B.R. at 217–18, in which spousal debtors filing separately classified and treated common creditors differently from individual creditors in order to abuse exemption laws, presented different questions from the case at bar.

24. The Trustee and the court are amenable to confirmation of plans that exceed three years, *see* Code § 1322(d), in order to leave a debtor some room to cover contingencies.

25. In a sense the flaw in the Modification is that it may underpay Richard's unsecured creditors. Relieving Patsy of her prepetition unsecured obligations, which at the time of *In re Nahat* reduced what Richard could pay to his unsecured creditors, should automatically make more money available to pay on his unsecured claims.

As the court's ruling is without prejudice, Richard may propose another modification as well. Should any modification require that the court recalculate Richard's disposable income, the court will then do so.

The Trustee is directed to prepare and submit to the court orders consistent with this opinion.

**SO ORDERED** this 22nd day of July 2004.